**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| **FEDERAL TRADE COMMISSION**, and **STATE OF CONNECTICUT**,       Plaintiffs,       v. **TICKETNETWORK, INC.**,     a corporation; **TICKET SOFTWARE, LLC**,     a limited liability company; **RYADD, INC.**,     a corporation; **RYAN J. BAGLEY**,     individually and as an officer of     **RYADD, INC.**; **CHARLES A. LINEBERRY**,     individually and as an officer of     **RYADD, INC.**; **SECUREBOXOFFICE, LLC**,     a limited liability company; and **JAMES P. MORAN**,     individually and as a member of     **SECUREBOXOFFICE, LLC**,       Defendants. | Case No. _____ Date _July 24, 2014_____ |

**COMPLAINT FOR PERMANENT INJUNCTION AND OTHER RELIEF**

Plaintiffs, the Federal Trade Commission ("FTC") and the State of Connecticut (the "State"), for their Complaint allege:

1.    The FTC brings this action under Section 13(b) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 53(b), to obtain permanent injunctive relief, rescission or reformation of contracts, restitution, the refund of monies paid, disgorgement of ill-gotten

monies and other equitable relief for Defendants' acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

2.      The State of Connecticut, by and through George Jepsen, the Attorney General of the State of Connecticut, acting at the request of William M. Rubenstein, Commissioner of the Connecticut Department of Consumer Protection, brings this action under the Connecticut Unfair Trade Practices Act ("CUTPA"), Chapter 735a of the Connecticut General Statutes, and more particularly General Statutes § 42-110m, to obtain injunctive relief against the Defendants' alleged violations of General Statutes § 42-110b(a), to obtain other relief as is necessary to redress injury to consumers resulting from the Defendants' violations of law, and disgorge Defendants of ill-gotten money and civil penalties, pursuant to General Statutes § 42-110o(b).

## JURISDICTION AND VENUE

3.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345, and 15 U.S.C. §§ 45(a) and 53(b).

4.      This Court has supplemental jurisdiction over the plaintiff State of Connecticut's claims under 28 U.S.C. § 1367.

5.      Venue is proper in this district under 28 U.S.C. § 1391(b) and (c), and 15 U.S.C. § 53(b).

## PLAINTIFFS

6.      The FTC is an independent agency of the United States Government created by statute. 15 U.S.C. §§ 41-58. The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce. The FTC is authorized to initiate federal district court proceedings, by its own attorneys, to enjoin violations of the FTC Act and to secure such equitable relief as may be appropriate in each case, including

rescission or reformation of contracts, restitution, the refund of monies paid, and disgorgement of ill-gotten monies.  15 U.S.C. § 53(b).

7.     The State of Connecticut, through its Attorney General acting at the request of the Commissioner of Consumer Protection, is authorized to initiate proceedings to enjoin violations of CUTPA and to seek injunctive relief, restitution and civil penalties and other equitable relief as this Court deems appropriate.  Connecticut General Statutes §§ 42-110m and 42-110o.

### DEFENDANTS

8.     Defendant TicketNetwork, Inc. is a Delaware corporation with its principal place of business at 75 Gerber Road East, South Windsor, CT 06074.  At all times material to this Complaint, acting alone or in concert with others, TicketNetwork, Inc. has advertised, marketed, distributed, or sold resale event tickets to consumers throughout the United States. TicketNetwork, Inc. runs a program, the "TicketNetwork Resale Partner Program" (hereinafter, "TN Partner Program"), through which "Partners" advertise and market resale event tickets in TicketNetwork, Inc.'s inventory through their own websites that are linked to websites owned by TicketNetwork, Inc.  TicketNetwork, Inc. transacts or has transacted business in this district.

9.     Defendant Ticket Software, LLC, also doing business as TicketNetwork Direct, is a wholly-owned subsidiary of TicketNetwork, Inc., and a Connecticut limited liability company with its principal place of business at 75 Gerber Road East, South Windsor, CT 06074.  Ticket Software, LLC is the operating entity for TicketNetwork, Inc. and, for example, holds the intellectual property rights and employs personnel for TicketNetwork, Inc.  At all times material to this Complaint, acting alone or in concert with others, Ticket Software, LLC has advertised, marketed, distributed, or sold resale event tickets to consumers throughout the United States. Under the name TicketNetwork Direct, Ticket Software, LLC runs the TN Partner Program with TicketNetwork, Inc.  Ticket Software, LLC transacts or has transacted business in this district.

3

10.     Defendant Ryadd, Inc. ("Ryadd") is a Texas corporation with its principal place of business at 3013 Raspberry Road, Austin, TX 78748. From 2010 to December 2011, Ryadd was incorporated in Virginia. From 2007 through 2009, Ryadd operated as Ryad, LLC, a Connecticut limited liability corporation. Ryadd operates the website, www.official-online-tickets.com, among others, and is a "Partner" in the TN Partner Program. Ryadd joined the TN Partner Program in 2006. At all times material to this Complaint, acting alone or in concert with others, Ryadd has advertised, marketed, distributed, or sold resale event tickets to consumers throughout the United States. Ryadd transacts or has transacted business in this district.

11.     Defendant SecureBoxOffice, LLC ("SBO") is a Connecticut limited liability corporation that had its principal place of business at 31 Rocklyn Drive West, Simsbury, CT 06092 from June 2011 until sometime in 2013 when it relocated to San Diego, CA. SBO operates the website, www.secureboxoffice.com, among others, and is a "Partner" in the TN Partner Program. SBO joined the TN Partner Program in 2009. At all times material to this Complaint, acting alone or in concert with others, SBO has advertised, marketed, distributed, or sold resale event tickets to consumers throughout the United States. SBO transacts or has transacted business in this district.

12.     Defendant Ryan J. Bagley ("Bagley") was a sales executive at TicketNetwork from at least 2005 through mid-January 2011, and has been a co-owner of Ryadd from at least September 2010 through the present. Bagley has directly participated in the creation of Ryadd's advertising and marketing, including buying domain names and creating paid search engine advertisements and websites. At times material to this Complaint, individually, or in concert with others, Bagley has formulated, directed, controlled, or participated in the acts and practices alleged herein. During all or part of the relevant time period, Bagley has resided in this district

4

and, in connection with the matters alleged herein, transacts or has transacted business in this district and throughout the United States.

13.     Defendant Charles A. Lineberry ("Lineberry") is co-owner of Ryadd.  Lineberry has directly participated in the creation of Ryadd's advertising and marketing, including buying domain names and creating paid search engine advertisements and websites.  At times material to this Complaint, individually, or in concert with others, Lineberry has formulated, directed, controlled, or participated in the acts and practices alleged herein.  In connection with the matters alleged herein, Lineberry transacts or has transacted business in this district and throughout the United States.

14.     Defendant James Moran ("Moran") is the sole owner and manager of SBO. Moran has directly participated in the creation of SBO's advertising and marketing, including buying domain names and creating paid search engine advertisements and web pages.  At times material to this Complaint, individually, or in concert with others, Moran has formulated, directed, controlled, or participated in the acts or practices alleged herein.  Moran resides in this district and, in connection with the matters alleged herein, transacts or has transacted business in this district and throughout the United States.

## COMMERCE

15.     At all times material to this Complaint, Defendants have maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. §44.

## DEFENDANTS' BUSINESS ACTIVITIES

### The Secondary Ticket Market

16.     Defendants all are involved in the secondary ticket market (the "Secondary Market"), in which resellers such as ticket brokers and other individuals sell tickets to consumers

for a variety of events including, but not limited to, sporting events, concerts, and theatrical performances.

17.     The Secondary Market is separate and distinct from the primary ticket market (the "Primary Market"), in which consumers purchase tickets directly from either a venue box office or from a ticket service – such as Ticketmaster – which contracts with event venues, promoters, and sports teams to offer and sell tickets on their behalf, generally at face value.

18.     The Secondary Market exists mostly online.  On one end of the transaction is a consumer shopping for a ticket for an event; on the other end is a ticket reseller who holds a ticket or will attempt to procure a ticket for a consumer.  The vast majority of tickets available for sale on the Secondary Market are held by professional ticket brokers who obtain tickets from a variety of sources, with the intent to resell at a price above the ticket's face value.

19.     The Secondary Market generates billions of dollars in annual revenues.  The industry has benefited not only from technologies that enable the efficient distribution of resale tickets, but also from a number of states, including Connecticut, that have repealed anti-scalping laws.

20.     At all times material to this Complaint, TicketNetwork has operated one of the largest ticket resale marketplaces in the United States.  Event tickets sold through TicketNetwork's exchanges often are priced above face value.  TicketNetwork offers these resale event tickets through its proprietary websites, www.ticketnetwork.com and www.ticketliquidator.com.  In addition, TicketNetwork promotes the purchase of resale event tickets through Partners in its TN Partner Program who place their own advertisements and operate their own websites.  TicketNetwork does not provide ticketing services for the Primary Market and does not contract with any venues or promoters to provide ticketing services on their behalf.

### Ryadd's and SBO's Resale Partner Program Practices

21.    TicketNetwork began selling tickets on the Secondary Market through its Partner Program in 2006.  TicketNetwork licenses standard ticket website templates, plug-in software, and web services to its Partners, who then advertise the resale event tickets in TicketNetwork's inventory through their own websites.  The plug-in software designed and provided by TicketNetwork enables its Partners to access TicketNetwork's inventory feed and to display ticket listings, venue maps with seat locations, and other information about the tickets on their websites.  It also handles credit card processing and other key functions.  TicketNetwork liaison personnel also provide routine assistance to Partners, including advice on upcoming shows, training on pay-per-click marketing, complaint-handling, and emergency technical assistance.

22.    TicketNetwork contracts with Partners to act on its behalf to market and sell tickets in order to generate more revenue for TicketNetwork.  TicketNetwork earns fees on every Partner ticket sale. The Partner Program over the years has become one of TicketNetwork's most profitable segments.

23.    Most, if not all, consumers who purchase event tickets through a TicketNetwork Partner website begin their ticket search using an Internet search engine such as Google.  Search engine results frequently include advertisements placed by one or more of TicketNetwork's Partners, which advertisements link to the Partners' resale ticket websites.

24.    Numerous Ryadd and SBO search engine advertisements and websites have been designed to resemble official sites for venues holding events, or other entities authorized by the venues to sell tickets at the face value price.  The technique used by Ryadd and SBO is to employ hundreds of individual websites (sometimes called "microsites"), each mimicking an individual event venue.  In many instances, the website domain name, which is also included as a link in the search engine advertisement for the website, is almost identical to an actual venue's

7

website name (*e.g.*, Ryadd's site, www.raymond-james-stadium.org, mimicked the official site, www.raymondjamesstadium.com). In other cases, these Partners obtain domain names mimicking only part of a venue name, then add venue-specific text to the "display URL" shown in their online advertisements. For example, Ryadd purchased the domain name "center-dc.org" and then added the subdomain "verizon" to form the display URL "verizon.center-dc.org" used in its search engine advertisements. In many instances, the webpages on these microsites further imitate the actual venue websites through their titles, visual images, descriptions, or other content.

25.    Since at least September 2010, Ryadd has operated and controlled hundreds of website domains employing the advertising and marketing techniques that are addressed in this complaint. Ryadd is or has been one of TicketNetwork's leading Partners during the relevant time period.

26.    Since at least June 2011, SBO has operated and controlled over 140 website domains employing the advertising and marketing techniques that are addressed in this complaint. SBO is or has been another one of TicketNetwork's leading Partners during the relevant time period.

**Examples of Consumer Experience Purchasing
Tickets Through Ryadd Websites**

27.    The following is an example of one search engine advertisement that Ryadd placed during the relevant period. A consumer who typed the phrase "radio city music hall" into

8

a Google search engine box would see the following search results:



28.    The first listed result is a paid advertisement for a resale website owned and operated by Ryadd, doing business as Official Online Tickets, promoting resale tickets in TicketNetwork's inventory.  All three lines convey the impression that clicking on this advertisement will take consumers to the "official" website for Radio City Music Hall:

> Radio City Music Hall/ RadioCity MusicHall-NY.com
> radiocity.musichall-ny.com
> Official Ticket Source Online for Radio City Music Hall Tickets in NY

Ryadd uses the actual venue name in the first and second lines of the advertisement, followed by a third line claiming it is the "Official Ticket Source Online" for the venue.  In fact, Ryadd filed a trademark application in July 2011 for the phrase "Official Ticket Source Online," which, as illustrated herein, it then connected with whatever specific venue it was advertising (*e.g.*, Official Ticket Source Online for Radio City Music Hall Tickets in NY).

29.    The second line of Ryadd's advertisement – "radiocity.musichall-ny.com/" – is called the "display URL."  Pursuant to Google's search engine policies, a display URL does not

have to be the exact URL to which consumers are directed, but it must contain the actual URL

owned by the advertiser.  In the above example, Ryadd added the more venue-specific detail

("radiocity") to the display URL.  The actual URL owned by Ryadd, to which consumers were

directed, is "musichall-ny.com."

     30.    A consumer who clicked on the blue hyperlink in this ad ("**Radio City Music**

**Hall | RadioCity.MusicHall**-NY.com") was directed to the landing page of a Ryadd website.

The top of the website's landing page appeared as follows:



     31.    The most physically prominent feature on the landing page is the title in large

print – "Radio City Music Hall" – accompanied by a visual image of the venue.   Underneath the

title, in much smaller type, there is language stating "Powered by Official Online Tickets.  No

affiliation with official site."

     32.    On the left side of the landing page, under the "Browse Events at Radio City

Music Hall" heading, is a table of general ticket listings with information generated through a

feed from TicketNetwork's inventory.

33.     On the right side of the landing page, there is location information about the

venue in the "Radio City Music Hall Info" section at the top.  On the bottom right side is a

section entitled "About Radio City Music Hall," which provides more specific facts about the

venue.  For example:

> Radio City Musical [sic] Hall has been one of the premier entertainment
> destinations in the world since opening in 1932 in New York City in the
> Rockefeller Center.  The Radio City name was derived from the first
> tenants the Radio Corporation of America.  Radio City Music Hall has
> housed the Radio City Christmas Spectacular as an annual holiday musical
> production since 1933 featuring the dance team known as the Rockettes.
> The seating capacity is 5,933 for most shows.

In the middle of the right side of the landing page, in small print in the "Ticket Information"

section, Ryadd included the following text:

> Price: Ticket Prices Can Be Below Or Above Face Value.
> Inventory: We Are A Secondary Market Ticket Provider Utilizing The
> Most Extensive Network of Buyers And Sellers of Event Inventory For
> Buyers and Sellers.

34.     Ryadd only added the following fine print, under the heading box of the landing

pages for its Official Online Tickets websites, in or around fall 2011: "We are an independently

owned and operated site specializing in sales in the secondary market. We are not affiliated with

any primary website, venue, or box office."

35.     The disclaimers on the landing page, given their size, placement, language, and

other factors, are insufficient to dispel the net impression conveyed by Ryadd's preceding

Google advertisements, and the more prominent venue elements on the landing page itself, that

this website is the official site for Radio City Music Hall or is the official site of an entity

authorized by Radio City Music Hall to sell tickets at face value.

11

36.    A consumer who clicked on a "View Tickets" button on the landing page was directed to a ticket listing page providing specific information about tickets available in TicketNetwork's inventory for the consumer's chosen event, for example:



37.    As with the preceding landing page, the most prominent features on this page are the title "Radio City Music Hall," together with the visual image of the venue and the seating map. The information provided in each of the ticket listings and in the venue map is created and maintained by TicketNetwork through its software plug-in that links to TicketNetwork's inventory.

12

38.     The list price for each ticket is based on the price set by the actual reseller (*e.g.*, broker), plus a mark-up by Ryadd, and an additional markup by TicketNetwork. In many instances, a ticket's list price exceeds its face value price, which is not displayed.

39.     In fall 2011, TicketNetwork modified the plug-in software that its Partners use to display venue maps of their sites, allowing Partners to place the following fine print to appear above the venue map: "We are a resale marketplace, not a box office or venue."  As in the case of the landing page disclosure, this disclaimer also was insufficient to dispel the net impression created by the Google advertisements and the landing page that this is the official website for Radio City Music Hall or is the official site of an entity authorized by Radio City Music Hall to sell tickets at face value.  In fact, prior to TicketNetwork's adding this language, Defendant Bagley advised the company that venues who had complained about the practices of TicketNetwork Partners would not find this to be an adequate disclaimer.

40.     A consumer who clicked on a "Buy" button for tickets on the ticket listing page was directed to a checkout page, for example:



41.     This page contains a bold, prominent heading, supplied by Ryadd, which reads "Official Online Tickets."  Buried in fine black print at the end of the "Please Note" area in the "Tickets" section is the statement, "We are a resale marketplace, not a box office or venue."

42.     The top left corner of the checkout page provides the following information in fine black print:

> Price: Ticket Prices Can Be Below Or Above Face Value.
> Inventory: We Are A Secondary Market Ticket Provider Utilizing The Most Extensive Network of Buyers And Sellers of Event Inventory For Buyers and Sellers.

Ryadd's principals discussed in internal emails their goal of displaying this information in a manner least likely to be noticed by consumers.  Prior to fall 2011, Ryadd did not provide this Ticket Information box on its checkout pages.

43.     TicketNetwork controlled the "terms and policies" section on the checkout page. If a consumer scrolls down to the bottom of the checkout page, below the "Billing Information" fields, there is a section asking: "Have you read and do you agree to our terms and policies?" with radio buttons, i.e., clickable circles, reading "Yes" and "No."  Below this question is a scroll box containing information about the consumer's purchase, as illustrated:

44.     The first sentence of this scroll box states: "General. Official Online Tickets.com acts as an intermediary between buyers and sellers (defined below) to facilitate the purchase and sale of event tickets…".  On the 11th line of dense text there is also a reference that "tickets sold through SITE are often obtained through secondary market TICKET SELLERS and are being resold, in many cases, above the price or 'face value' listed on the ticket."



45.     The foregoing disclaimers, by virtue of their placement, size, language, and other factors, are also insufficient to dispel the misleading net impression conveyed by the title of this page, the preceding Google advertisements, the landing page, and the buy tickets page.  In addition, a consumer does not have to scroll down within the "terms and policies" box to complete this transaction; rather, the consumer could simply click "Yes" above it, and then click the "Continue" button at the bottom of the webpage to review the order, and ultimately complete the transaction.

46.     The following is another example of a search engine advertisement that Ryadd placed during the relevant period.  A consumer searching for an event at the XL Center in Hartford, Connecticut, who typed the phrase "xl center" into a Google Search engine box, would see the following search results:

15



47.    The first listed result is an advertisement for a Ryadd resale website. The first

three lines convey the impression that clicking on this advertisement will take consumers to the

"official" website for the XL Center in Hartford, Connecticut:

> XL Center – Official Ticket source Online For
> xl.centerhartford.com/
> The XL Center tickets in Hartford
> Ringling Brothers Circus – Justin Bieber – US Gymnastics Championships

48.    In the above example, Ryadd added the more venue-specific detail in the display

URL, "xl.centerhartford.com."  The actual URL owned by Ryadd, to which consumers are

directed, is "centerhartford.com."

49.    A consumer who clicked on any of the blue hyperlinks in this ad was directed to the Ryadd website promoting resale tickets in TicketNetwork's inventory. This website follows a slightly modified format that Ryadd began using on some of its microsites some time in 2012. The landing page contains similar venue-mimicking elements as shown above, but is headlined with a more generic title as follows:



50.    The most physically prominent feature on the landing page is the title in large print – "Hartford Tickets" – accompanied by a visual image of the actual XL Center

17

in Hartford. Predecessor pages on this website used the banner "XL Center" instead. In

this example, the sections on the right side of the page labeled "XL Center Info" and

"About XL Center" include facts about that particular venue:

> The XL Center, formerly The Hartfod (sic) Civic Center, is a multi-use
> arena, located just off Interstate 95 in Hartfod (sic), Connecticut. The XL
> Center is a scalable venue, is a sports and convention complex located in
> Hartford, Connecticut, USA, owned by the City of Hartford and operated
> by Anschutz Entertainment Group under contract with the Connecticut
> Development Authority CDA. The arena is ranked the 28th largest among
> college basketball arenas. Originally located adjacent to a shopping mall
> Civic Center Mall, which was demolished in 2004, it was originally built
> in 1975 and consists of two facilities: the Veterans Memorial Coliseum
> and the Exhibition Center.

51.    This landing page includes the same fine print disclaimer that appears in the

Radio City Music Hall landing page: "We are an independently owned and operated site

specializing in the secondary market. We are not affiliated with any primary website, venue, or

box office." Underneath the title, in much smaller type, there also is a passage stating: "Powered

by Official Online tickets. No Affiliation with Official Site."

52.    A consumer who clicked on a "View Tickets" button was directed to a ticket

listing page, for example:

18



Like the Radio City Music Hall ticket page, this ticket page states in small print above the venue

map: "We are a resale marketplace, not a box office or venue."

    53.    A consumer who clicked on the "Buy" button of this page was directed to a

checkout page that looks almost identical to that in the previous example, as illustrated below:



    54.    If a consumer scrolled down the checkout page to the bottom third of the page, the

"terms and policies" box would appear below the "Billing Information" section:



55.     If the consumer then scrolled down within the "terms and policies" box,

additional information important to the consumer's purchase would appear again, for example:

56.     The disclaimers on the web pages and the "terms and policies" section, which are

identical to those on the Radio City Music Hall website, are insufficient to dispel the net

impression created by Ryadd's Google advertisements and its web pages that this is the official

21

website for the XL Center in Hartford or is the official site for an entity authorized by the XL Center to sell tickets at face value.

57.    Defendant Ryadd generated hundreds of similarly-designed, venue-specific Ryadd websites and thousands of similarly-designed paid Google advertisements to sell resale event tickets in TicketNetwork's inventory.

### Examples of the Consumer's Experience Purchasing Tickets Through SBO Websites

58.    The consumer experience purchasing event tickets on a resale website maintained by SBO, another TicketNetwork Partner, is very similar to that of consumers purchasing event tickets on a Ryadd resale website.

59.    The following is an example of one search engine advertisement that SBO placed during the relevant period.  A consumer who typed the phrase "palace theater albany" into a Google search engine box would see the following search results:



60.     The first listed result is a paid advertisement for an SBO resale website promoting resale tickets in TicketNetwork's inventory.  All three lines convey the impression that clicking on this advertisement will take consumers to the website of the actual Palace Theater in Albany:

> Palace Theater Albany – Buy Palace Theater Albany Tickets
> palace.albanyboxoffice.com
> Save More at AlbanyBoxOffice.com

61.     In the above example, SBO added the more venue-specific detail, *i.e.*, "palace," to the display URL, "palace.albanyboxoffice.com/."  The actual URL owned by SBO, to which consumers are directed, is "albanyboxoffice.com."

62.     A consumer who clicked on the blue hyperlink in the ad was directed to an SBO website with the following landing page:



63.     The most physically prominent features on the landing page include the title,

AlbanyBoxOffice.com, and the list of available tickets at the Palace Theater Albany.  At the top

right is the statement:

> You Are Shopping
> Palace Theater
> Albany, NY 12207
> United States of America

This information adds to the net impression that this site is the official website of Albany Palace

Theater or is the official site of an entity authorized by the Palace Theater to sell tickets at face

value.

64.     Like the Ryadd websites, the information provided in the general ticket listings is

created by a feed from TicketNetwork's inventory.

65.     A consumer who clicked on a "View Tickets" button was directed to a ticket

listing page, for example:



66.     The most physically prominent features on the page include the title,
"AlbanyBoxOffice.com," the list of available tickets at the Palace Theater Albany, and the
seating map for that venue.  TicketNetwork creates and maintains the information provided in
the ticket listings.  The SBO website is able to access and display TicketNetwork's inventory
through the Ticket Network software plug-in.  In fall 2011, TicketNetwork modified the plug-in
software that its Partners use to display venue maps on their sites and, thereafter, the SBO sites
have included the following disclaimer in small print: "We are a resale marketplace, not a box
office or venue."

67.     Similar to the ticket prices on the Ryadd websites, SBO's list price for the tickets
is based on the price set by the actual reseller plus mark-up by SBO and TicketNetwork.  In
many instances, the ticket's list price significantly exceeds its face value, which is not displayed
on the website.

68.     A consumer who clicked on a "Buy" button was directed to a checkout page, for
example:

69.    This checkout page, also titled "AlbanyBoxOffice.com," displays the tickets that the consumer is about to purchase, delivery options, and a box for credit card information. Above "delivery options," in very small type, is the same set of purported disclosures that appear on the right side of Ryadd's landing pages:

> Please Note:
> All prices are in US Dollars ($)
> Total does not include state or local, or other taxes if applicable
> We are a resale marketplace, not a box office or venue

70.    Like on the Ryadd websites, TicketNetwork controls the content of the "terms and policies" box. If a consumer scrolls down to the bottom of the checkout page, below the "Billing Information" fields, there is a section asking: "Have you read and do you agree to our terms and policies?" with radio buttons reading "Yes" and "No." Below this question in the "terms and policies" box appears information about the consumer's purchase, for example:

71.    A consumer does not have to scroll down within the "terms and policies" box to complete the transaction; rather, the consumer simply could click "Yes" above it, and then click the "Continue" button at the bottom of the webpage to review the order, and ultimately complete his transaction.

72.    If the consumer scrolls within the "terms and policies" box, additional information such as the following appears:

Above Face Value. Tickets sold through SITE are often obtained through secondary market TICKET SELLERS and are being resold, in many cases, above the price or "face value" listed on the ticket. All ticket prices include additional service charges and handling fees as defined on each order. SITE and its TICKET SELLERS are not directly affiliated with any performer, sports team, or venue; and SITE does not act as a primary sale box office, unless otherwise stated. By agreeing to these TERMS, USER agrees that the purchase price for tickets on their order does not reflect the original purchase price of the ticket and may be either higher or lower than the original purchase price.

Orders. Orders placed through SITE will be fulfilled by one of our network of participating TICKET SELLERS.

73.    The disclaimers in SBO's webpages, by virtue of their placement, size, language, and other factors, are insufficient to dispel the net impression conveyed by the company's Google advertisements and webpages that this is the official website for Palace Theater Albany or is the official site for an entity authorized by the Palace Theater Albany to sell tickets at face value.

74.    The following is another example of a search engine advertisement that SBO placed during the relevant period. A consumer searching for an event at the Performing Arts Center (PAC) in Providence, Rhode Island, who typed the phrase "providence performing arts center" into a Google Search engine box, would see the following search results:

27



75.    The second result is a paid Google advertisement for an SBO resale website. All three lines convey the impression that clicking on this advertisement will take shoppers to the website of the actual Providence Performing Arts Center where they can obtain tickets from the "box office" at face value:

> Providence PAC Tickets/ pac.providenceboxoffice.com
> pac.providenceboxoffice.com
> Buy Providence PAC Tickets. Official ProvidenceBoxOffice Site

76.    In this advertisement, SBO added the more venue-specific detail in the display URL, "pac.providenceboxoffice.com/." The actual URL owned by SBO, to which consumers are directed, is "providenceboxoffice.com."

77.    A consumer who clicked on the blue hyperlink in the ad was directed to an SBO

website with the following landing page:



78.    A consumer who clicked on the "View Tickets" button on the landing page was

directed to a ticket listing page, for example:



79.    The checkout page to which consumers were directed if they clicked the "Buy"

button looks almost identical to that in the previous example, as illustrated below:



80.     If a consumer scrolled down to the bottom third of the checkout page, the "terms

and policies" box appeared below the "Billing Information" section, as follows:



81.     If a consumer scrolled down again, within the "terms and policies" box, additional

information appeared, for example:

82.     The disclaimers in these webpages, by virtue of their placement, size, language, and other factors, are insufficient to dispel the net impression conveyed by SBO's Google advertisements and its webpages that this is the official website for the Providence Performing Art Center or is the official site for an entity authorized by the Providence Performing Arts Center to sell tickets at face value.

83.     Defendant SBO generated hundreds of similarly-designed, venue-specific SBO websites and hundreds of similarly-designed paid Google advertisements to promote such websites and to sell resale event tickets in TicketNetwork's inventory.

84.     Similar to its relationship with Ryadd, TicketNetwork, through its plug-in software, maintains and controls the ticket information, venue maps, and checkout pages displayed on all of the SBO websites.

85.     TicketNetwork has received numerous complaints from consumers, event promoters, venues themselves, and various consumer protection agencies (*e.g.*, the Better Business Bureau ("BBB") and state Attorney General offices) about the above-described marketing practices of TicketNetwork's Partners.  TicketNetwork's legal department and key managers were aware of many of these complaints.  Complaints from venues that Ryadd and SBO were mimicking their sites and violating intellectual property laws were routinely handled by its legal department, and forwarded to Ryadd and SBO.  TicketNetwork also received notice from ticket brokers that they often received complaints from consumers when their tickets were sold through Partners' venue-mimicking websites.

32

## TicketNetwork's Participation in the
## Deceptive Conduct of Ryadd and SBO

86.    TicketNetwork contracts with its Partners to act on its behalf to market and sell

tickets in TicketNetwork's inventory.  TicketNetwork's purpose in hiring Ryadd and SBO has

been to drive more ticket sales to the exchange and obtain more fees.  TicketNetwork has offered

financial incentives to Ryadd and SBO to sell aggressively.

87.    TicketNetwork also purports to control pertinent aspects of its Partners' selling

techniques.  Its Partner Guidelines, in force during the relevant period, have expressly prohibited

Partners from engaging in intellectual property violations, including the making of false venue

affiliation claims as alleged in this Complaint.  In fact, when venues complained about Ryadd

and SBO advertisements like those challenged herein, TicketNetwork often exercised this control

to defuse the complaints and bad publicity.  However, TicketNetwork did not require Ryadd or

SBO to terminate the venue-mimicking tactics employed in the vast majority of their microsites.

88.    TicketNetwork knowingly has profited from the deceptive venue-mimicking

tactics of Ryadd and SBO.  TicketNetwork earned substantial fees on Ryadd's and SBO's

increased sales.  In fact, TicketNetwork knew or should have known that Ryadd and SBO were

making the misrepresentations alleged in this Complaint.  A number of the complaints that

TicketNetwork received from venues, customers, BBBs, or government authorities attached

examples of Ryadd or SBO search engine pages or webpages that facially mimicked actual

venues.  TicketNetwork executives on numerous occasions also worked closely with Ryadd or

SBO principals to coordinate responses to these complaints.

89.     TicketNetwork, in addition to recruiting Ryadd and SBO to act on its behalf, directly participated in their deceptive acts through the following means, among others:

(A)     Bagley, while an employee at TicketNetwork, was a full participant in the creation of the deceptive content of Ryadd's advertising campaign.  Among other things, Bagley hired the computer programmer who built the microsites; helped devise the venue photos, venue titles, and venue descriptions on Ryadd microsites; worked on minute details like fonts and choice of venue logos; and conferred with Lineberry and TicketNetwork on how to defuse complaints.  These actions lasted from approximately September 2010 through mid-January 2011, after which Bagley left TicketNetwork to join Ryadd full-time.  His superiors at TicketNetwork knew he was working on Ryadd strategies during normal company hours, and viewed such assistance as part of his job.  Bagley's efforts also served TicketNetwork's purpose of growing the TicketNetwork exchange.

(B)     On repeated occasions, TicketNetwork and Ryadd executives jointly decided to modify only the single Ryadd "microsite" targeted by a venue complaint, rather than abandon Ryadd's deceptive business model.  TicketNetwork personnel did so, even though they knew or should have known that Ryadd thereby would continue to operate hundreds of microsites that mimicked other venues in the same fashion.

(C)     TicketNetwork personnel other than Bagley, on repeated occasions, also exercised joint decision-making authority with Ryadd or SBO executives regarding details of the deceptive content of advertisements.  TicketNetwork executives at times urged only those website content changes that would not significantly decrease sales.  The general goal was to maintain Ryadd's basic business model for as long

34

as possible while TicketNetwork executives helped to fend off government investigations and private complaints.

(D)    TicketNetwork personnel also gave critical technical assistance to help keep facially deceptive websites up and running, for example, by obtaining security certificates for websites related to Ryadd's "official-online-tickets.com" advertising campaign. Later, when Google suspended numerous Ryadd websites, TicketNetwork technical personnel made it a priority to quickly create checkout pages for replacement Ryadd websites. Numerous such websites facially mimicked actual venue sites (*e.g.*, "foxcitiesperformingartscenter.org") or otherwise were designed to create the misimpression of being an actual venue site (*e.g.*, the term "Verizon" was appended to the registered domain name "theatergrandprairie.com" so that the website would appear as "Verizon.theatergrandprairie.com).

(E)    TicketNetwork also provided spurious "legal cover" to Ryadd and SBO by mandating the use of facially inadequate disclosures, and using those disclosures as a pretext for refusing consumer refunds. One set of disclosures was in the forbidding "terms and policies" scroll-down portion of the checkout pages, *see, e.g.*, Paragraphs 43 to 45. The size, language, font, and other aspects of the disclosure were controlled by TicketNetwork.

## DEFENDANTS' VIOLATIONS OF THE FTC ACT

90.    Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

91.    Misrepresentations or omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act.

35

## COUNT I

### Deceptive Representation That Resale Websites Were Official Websites for the Venue or Other Entity Authorized by the Venue to Sell Tickets
### (By Plaintiff Federal Trade Commission)

92.    In numerous instances, from at least September 2010 to the filing of this Complaint, in connection with the advertising, marketing, promotion, offering for sale, or sale of resale event tickets through websites owned and operated by Ryadd and SBO, Defendants have represented, directly or indirectly, expressly or by implication, through the means, including, but not limited to, those set forth in Paragraphs 16 through 89 above, that these websites are the official websites for the venue or other entity authorized by the venue to sell tickets at face value.

93.    In truth and in fact, the Ryadd and SBO websites are not the official websites for the venue or other entity authorized by the venue to sell tickets at face value. Ryadd and SBO are not affiliated with any venue, sports team, performer, or promoter, and they sell resale tickets in partnership with TicketNetwork, often at prices significantly higher than face value.

94.    Therefore, the representation set forth in Paragraph 92 is false and misleading and constitutes a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## COUNT II

### Deceptive Failure to Disclose Material Information Regarding Resale Websites
### (By Plaintiff Federal Trade Commission)

95.    In numerous instances, in connection with the advertising, marketing, promotion, offering for sale, or sale of event tickets through the Ryadd and SBO websites, Defendants have represented, directly or indirectly, expressly or by implication, that consumers may purchase tickets for events at the prices listed on their websites.

36

96.     In numerous instances in which Defendants have made the representation set forth in Paragraph 95 of this Complaint, Defendants have failed to adequately disclose to consumers that: (1) Ryadd's and SBO's websites are offering resale tickets for sale; (2) the ticket prices often exceed the tickets' face value; and (3) the websites are not owned by the venue, sports team, performer, or promoter (as applicable) or authorized to sell tickets on their behalf. This information would be material to consumers in deciding whether to purchase tickets through these websites. The failure to adequately disclose this information resulted in consumers unknowingly paying substantially more than face value for event tickets.

97.     Defendants' failure to adequately disclose the material information described in Paragraph 96 above, in light of the representation described in Paragraph 95 above, constitutes a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## VIOLATIONS OF CUTPA

98.     CUTPA at § 42-110b(a) states the following: "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."

99.     CUTPA states at § 42-110a(4): "trade" and "commerce" shall mean the "advertising, the sale or rent or lease, the offering for sale or lease, or the distribution of any service or any property, tangible or intangible, real, personal or mixed, and any article, commodity, or thing of value in this state."

100.     CUTPA also states at § 42-110b(b) that: "[i]t is the intent that in construing subsection (a) of this section, the commissioner and the courts of this state shall be guided by interpretations given by the Federal Trade Commission and the federal courts to Section 5(a)(1) of the Federal Trade Commission Act (15 U.S.C. § 45(a)(1)), as from time to time amended."

101.     Defendants all operated, or have operated, from Connecticut.

37

102.   The acts and practices alleged in this Complaint all emanate from and are intimately associated with Connecticut, are directed at Connecticut consumers and affect ticket sales at Connecticut venues.  Defendants are therefore engaged in trade or commerce in the State of Connecticut.

**COUNT III**

**Deceptive Representation That Resale Websites Were Official Websites for the Venue or
Other Entity Authorized by the Venue to Sell Tickets
(By Plaintiff State of Connecticut)**

103.   In numerous instances, from at least September 2010 to the filing of this Complaint, in connection with the advertising, marketing, promotion, offering for sale, or sale of resale event tickets through websites owned and operated by Ryadd and SBO, Defendants have represented, directly or indirectly, expressly or by implication, through the means, including, but not limited to, those set forth in Paragraphs 16 through 89 that these websites are the official websites for the venue or other entity authorized by the venue to sell tickets at the original face value purchase price.

104.   In truth and in fact, the Ryadd and SBO websites are not the official websites for the venue or other entity authorized by the venue to sell tickets at the original face value purchase price.  Ryadd and SBO are not affiliated with any venue, sports team, performer, or promoter and sell resale tickets in partnership with TicketNetwork, often at prices significantly higher than face value.

105.   Defendants' acts and practices, as described herein, were likely to mislead consumers acting reasonably under the circumstances into believing that the Ryadd and SBO websites were the official websites for the venue or other entity authorized by the venue to sell tickets at face value.

38

106.    Defendants' representations as set forth in paragraph 103 of this Count were material to consumers' decisions about whether or not to purchase tickets from the Ryadd and SBO websites.

107.    Defendants have therefore engaged in unfair or deceptive acts and practices in violation of Conn. Gen. Stat. § 42-110b(a).

## COUNT IV

### Civil Penalties – Deceptive Representations (By Plaintiff State of Connecticut)

108.    The allegations of Paragraphs 103 through 107 of Count III are incorporated by reference as Paragraph 108 of Count IV as if fully set forth herein.

109.    Defendants engaged in the acts and practices alleged herein when they knew or should have known that their conduct was unfair or deceptive, in violation of Conn. Gen. Stat. § 42-110b(a), and, therefore, are liable for civil penalties of up to $5,000 per willful violation pursuant to Conn. Gen. Stat. § 42-110o(b).

## COUNT V

### *Per Se* Deceptive Representation of Affiliation (By Plaintiff State of Connecticut)

110.    The allegations of Paragraphs 103 through 107 of Count III are incorporated by reference as paragraph 110 of Count V as if fully set forth herein.

111.    Defendants' acts and practices violate § 42-110b-18(d) of the Regulations of Connecticut State Agencies, and constitute *per se* violations of CUTPA because Defendants have misrepresented the Ryadd and SBO websites as being affiliated with official websites for the venue or other entity authorized by the venue to sell tickets at the face value price.

112.    Defendants have therefore engaged in unfair or deceptive acts and practices in violation of Conn. Gen. Stat. § 42-110b(a).

## COUNT VI

### Civil Penalties – *Per Se* Deceptive Representations (By the State of Connecticut)

113.    The allegations of Paragraphs 110 through 112 of Count V are incorporated by reference as Paragraph 113 of Count VI as if fully set forth herein.

114.    Defendants engaged in the acts and practices alleged herein when they knew or should have known that their conduct was unfair or deceptive, in violation of Conn. Gen. Stat. §42-110b(a), and, therefore, are liable for civil penalties of up to $5,000 per willful violation pursuant to Conn. Gen. Stat. § 42-110o(b).

## COUNT VII

### Failure to Provide Full and Fair Disclosure (By Plaintiff State of Connecticut)

115.    In numerous instances, in connection with the advertising, marketing, promotion, offering for sale, or sale of event tickets through the Ryadd and SBO websites, Defendants have represented, directly or indirectly, expressly or by implication, through the means, including, but not limited to, those set forth in Paragraphs 16 through 89 that the websites are the official websites for the venue or other entity authorized by the venue to sell tickets at face value.

116.    In numerous instances in which Defendants have made the representation set forth in Paragraphs 16-89 of this Complaint, Defendants failed to fully disclose to consumers that: (1) Ryadd's and SBO's websites facilitate the resale of event tickets without authorization by any venue; (2) Ryadd and SBO have no affiliation with any venue, sports team, performer, or promoter; (3) tickets listed for sale on Ryadd's and SBO's websites are resale event tickets; and (4) tickets listed for sale on Ryadd's and SBO's websites are listed at prices that in many cases exceed their face value prices.  The omission of this information would be material to consumers in deciding whether to purchase tickets through these websites.  The failure to provide a full and

fair disclosure resulted in consumers unknowingly paying substantially more than face value for event tickets.

117.    Defendants' failure to provide a full and fair disclosure, described in Paragraph 116 above, in light of the representations described in Paragraph 115 above, constitutes unfair or deceptive acts and practices in violation of Conn. Gen. Stat. § 42-110b(a).

### COUNT VIII

### Civil Penalties – Failure to Disclose (By Plaintiff State of Connecticut)

118.    The allegations of Paragraphs 115 through 117 of Count VII are incorporated by reference as Paragraph 118 of Count VIII as if fully set forth herein.

119.    Defendants engaged in the acts and practices alleged herein when they knew or should have known that their conduct was unfair or deceptive, in violation of Conn. Gen. Stat. § 42-110b(a), and, therefore, are liable for civil penalties of up to $5,000 per willful violation pursuant to Conn. Gen. Stat. § 42-110o(b).

### COUNT IX

### *Per Se* Failure to Disclose Material Contingency (By Plaintiff State of Connecticut)

120.    The allegations of Paragraphs 115 through 117 of Count VII are incorporated by reference as paragraph 120 of Count IX as if fully set forth herein.

121.    Defendants' failure to conspicuously disclose each material contingency, condition or limitation to the offer, in light of the representations described in Paragraph 115 above, constitutes a *per se* unfair or deceptive act or practice pursuant to Regulations of Connecticut State Agencies § 42-110b-22.

122.    Defendants have therefore engaged in unfair or deceptive acts and practices in violation of Conn. Gen. Stat. § 42-110b(a).

## COUNT X

### Civil Penalties – *Per Se* Failure to Disclose Material Contingency
### (By Plaintiff State of Connecticut)

123.     The allegations of Paragraphs 120 through 122 of Count IX are incorporated by reference as Paragraph 123 of Count X as if fully set forth herein.

124.     Defendants engaged in the acts and practices alleged herein when they knew or should have known that their conduct was unfair or deceptive, in violation of Conn. Gen. Stat. § 42-110b(a), and, therefore, are liable for civil penalties of up to $5,000 per willful violation pursuant to Conn. Gen. Stat. § 42-110o(b).

### CONSUMER INJURY

125.     Consumers have suffered substantial injury as a result of Defendants' violations of the FTC Act and CUTPA.  In addition, Defendants have been unjustly enriched as a result of their unlawful acts or practices.  Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers, reap unjust enrichment, and harm the public interest.

### THIS COURT'S POWER TO GRANT RELIEF

126.     Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), empowers this Court to grant injunctive and such other relief as the Court may deem appropriate to halt and redress violations of the FTC Act.  The Court, in the exercise of its equitable jurisdiction, may award ancillary relief, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies, to prevent and remedy any violation of any provision of law enforced by the FTC.

127.     The counts based upon CUTPA may be enforced by this Court through its pendent or supplemental jurisdiction pursuant to 28 U.S.C. § 1367, and this Court may award relief under CUTPA, Conn. Gen. Stat. §§ 42-110m(a) and 42-110o(b).

## PRAYER FOR RELIEF

Wherefore, Plaintiffs, pursuant to Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), Conn.

Gen. Stat. §§ 42-110a, *et seq*. and the Court's own equitable powers, requests that the Court:

A.     Enter a permanent injunction to prevent future violations of the FTC Act and

CUTPA by Defendants;

B.     Award such relief as the Court finds necessary to redress injury to consumers

resulting from Defendants' violations of the FTC Act and CUTPA, including, but not limited to,

rescission or reformation of contracts, restitution, the refund of monies paid, civil penalties and

the disgorgement of ill-gotten monies;

C.     Award the State its attorneys fees; and

D.     Award Plaintiffs the costs of bringing this action, as well as such other and

additional relief as the Court may determine to be just and proper.


Dated:   __July 24____, 2014


Respectfully submitted,

JON NUECHTERLEIN
General Counsel


MAMIE KRESSES
DEAN C. GRAYBILL
Federal Trade Commission
600 Pennsylvania Avenue, N.W.
Room NJ-3212
Washington, D.C.  20580
(T) 202-326-2070 (Kresses)
(T) 202-326-3082 (Graybill)
(F) 202-326-3259
mkresses@ftc.gov
dgraybill@ftc.gov
Attorneys for Plaintiff
FEDERAL TRADE COMMISSION

GEORGE JEPSEN
ATTORNEY GENERAL

JONATHAN J. BLAKE
(CT 22321)
MATTHEW F. FITZSIMMONS
(CT 26981)
Assistant Attorneys General
Office of the Attorney General
110 Sherman Street
Hartford CT 06105
Tel: (860) 808-5400
Fax: (860) 808-5593
Jonathan.Blake@ct.gov
Matthew.Fitzsimmons@ct.gov
Attorneys for Plaintiff
STATE OF CONNECTICUT